**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ELI LILLY AND COMPANY,<br>Plaintiff,<br>v.<br>AP MAX INCORPORATED d/b/a SOUTHEND PHARMACY,<br>Defendant. | CASE NO. ____________________<br>**COMPLAINT**<br>JURY TRIAL DEMANDED |

1. AP Max Incorporated (d/b/a Southend Pharmacy) ("Southend") claims to be a Texas pharmacy engaged in lawful compounding of "personalized" drugs. In reality, Southend is unlawfully manufacturing and selling untested, unapproved weight loss drugs on a large scale—in violation of state and federal drug-approval requirements and state unfair competition laws, and at grave risk to patient safety.

2. Tirzepatide is the active ingredient in Plaintiff Eli Lilly and Company's MOUNJARO® and ZEPBOUND®, which are the *only* tirzepatide medicines that have been approved by the U.S. Food and Drug Administration ("FDA"). After nearly a decade of development, FDA approved MOUNJARO® and ZEPBOUND® to treat type 2 diabetes and to help certain adults with weight management and obstructive sleep apnea, respectively. To date, Lilly's medicines have undergone 37 completed clinical trials with more ongoing.

3. Lilly is the only company that has sought—and received—FDA's approval to market and sell tirzepatide. Lilly's tirzepatide medicines were tested and are approved only as single-ingredient medicines.

4. Southend makes and sells knockoff tirzepatide, including injections containing fixed-dose combinations of tirzepatide and pyridoxine (also known as vitamin B-6).[1]

5. Southend's tirzepatide drugs have never been approved by FDA, and Southend has never tested them in clinical trials.

6. Lilly files this action to stop Southend from selling its knockoff, unapproved tirzepatide drugs in violation of several states' laws.

7. Despite advertising itself as a "compounding pharmacy," the scale of Southend's operations makes it clear that Southend is not "compounding" tirzepatide. "Compounding" refers to the individualized preparation of a drug product for a specific patient who, for a clinical reason, cannot take an FDA-approved form of an existing drug (for example, because of an allergy to one ingredient). Southend instead is mass-manufacturing its untested tirzepatide products at commercial scale without seeking, or obtaining, approval from FDA or any state agency.

8. In doing so, Southend violates the laws of several of the states in which it operates, including at least Alaska, Colorado, Hawaii, Tennessee, Texas, and Washington, by selling drugs that have never been tested or approved for safety or effectiveness. By unlawfully selling unapproved compounded tirzepatide products in these states, Southend engages in unfair competition in violation of state statutes and common law.

9. By selling these unapproved and untested drugs, Southend is subjecting patients to "a giant, uncontrolled, unconsented human experiment," exposing them to substances whose safety and effectiveness have not been established, without adequate risk disclosure or the

---

[1] A "fixed-dose combination" drug product, as used here, includes one where two or more active ingredients are combined in a single dosage form. *See, e.g.*, 21 C.F.R. § 300.50.

protections inherent in regulated clinical research.[2] And in doing so, Southend leverages the reputation of Lilly, an international medicine company with a 150-year legacy, and with whom Southend has no affiliation.

10. Southend's actions create dangerous patient safety risks. Southend's practices lure consumers away from Lilly's safe and effective FDA-approved medicines in favor of Southend's untested and unapproved products. To protect patient safety and fair competition, Lilly brings this action pursuant to several states' laws.

## THE PARTIES

11. Plaintiff Eli Lilly and Company is a corporation organized and existing under the laws of Indiana and has its principal place of business in Indiana.

12. Defendant AP Max Incorporated (d/b/a Southend Pharmacy) is a corporation organized under the laws of Texas with a principal place of business at 10910 West Bellfort Street, Houston, TX 77099. Southend is a compounding pharmacy that sells compounded tirzepatide products, including tirzepatide combined with pyridoxine. Southend operates and conducts business in Texas, including by promoting and selling its tirzepatide product here.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction on diversity grounds pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000.

14. Southend is subject to personal jurisdiction in Texas because it has a principal place of business in Texas. Southend is also subject to personal jurisdiction in Texas because it has

[2] Richard Payerchin, *Deceptive information and online sales of compounded GLP-1 drugs put consumers at risk, advocates say*, Medical Economics (May 1, 2025), https://www.medicaleconomics.com/view/deceptive-information-and-online-sales-of-compounded-glp-1-drugs-put-consumers-at-risk-advocates-say.

significant contacts with the forum and has purposefully availed itself of the privilege of conducting business in Texas, including by operating and conducting business in Texas and by promoting and selling the tirzepatide products at issue in this Complaint into Texas and to Texas patients.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Southend resides and operates within the state and a substantial part of the events or omissions giving rise to Lilly's claim occurred in this District.

## GENERAL ALLEGATIONS

### I. FDA APPROVES PRESCRIPTION MEDICINES, FOLLOWING CLINICAL TRIALS AND THE DRUG APPROVAL PROCESS, TO SAFELY BRING MEDICINES TO MARKET

16. Drug approval is crucial for public health. As FDA explains, "American consumers benefit from having access to the safest and most advanced pharmaceutical system in the world."

17. Before a new prescription medication can be brought to market, it must be clinically tested through a rigorous series of studies designed to determine whether the medication is safe and effective for use under specific conditions and for specific indicated purposes.

18. To achieve FDA approval, companies must provide FDA with evidence proving the drug is safe and effective for its intended use. That evidence is subjected to a structured, multi-disciplinary review involving physicians, statisticians, chemists, pharmacologists, and other scientists. Approval is granted only if this independent and unbiased review establishes that a drug's health benefits outweigh its known risks.

19. Drug approval is notoriously hard to achieve. More than 90% of drug candidates ultimately fail. It is also an enormously costly and time-intensive process. On average, it takes 10–15 years and costs $2.6 billion to develop one new FDA-approved medicine.

20. To begin, drug sponsors must first identify a potential drug candidate through rigorous laboratory and analytical work. That work alone can take years, and usually requires consideration of scores, if not hundreds, of molecules before finding one with the desired therapeutic potential.

21. Once identified, the drug candidate must be evaluated through preclinical testing to determine if the product is reasonably safe for initial use in humans and to confirm that the candidate exhibits the expected pharmacological activity that justifies proceeding to human studies.

22. Based on laboratory, analytic, and preclinical testing, the drug sponsor is permitted to move the drug candidate into the clinical trial stage, in which it is tested in human subjects through a series of increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials.

23. Phase I clinical trials typically involve administering the drug to healthy volunteers. These are small studies that evaluate the drug candidate's safety and generate data to identify one or more doses that are sufficiently safe to be further tested. This determination typically culls a large portion of drug candidates—for example, averaging across diseases, only 52% of drug candidates that make it to Phase I testing will progress to Phase II.

24. Phase II trials are typically the first studies in which the drug is given to patients with the disease or condition to be treated. These studies vary in size and design but are generally designed to preliminarily establish that the drug will have its intended effect, while also generating additional safety data. Another swath of drug candidates is eliminated in Phase II; drug candidates for various diseases that make it to Phase II only progress to Phase III at rates between 15% and 48.1% depending on disease type.

25. Phase III trials are the pivotal step. These are typically large, multicenter studies that are double blind and well-controlled. These pivotal trials are required to confirm that the drug actually works, that the drug is safe for the intended patient population, and to identify and monitor potential side effects.

26. With the data assembled from the lab through Phase III, a sponsor is finally ready to seek FDA approval. To do so, the sponsor generally must pay a significant user fee (presently $4.31 million), on top of the investments in research and development, and must submit a new drug application ("NDA") or biologics licensing application ("BLA") that must contain full reports of every study conducted, must propose detailed labeling and risk management measures, and must detail every ingredient, every component, every facility, and every process or procedure involved in making the drug.

27. FDA then reviews the application, a process that usually takes between six to ten months. FDA's review is a structured, multi-disciplinary process involving physicians, statisticians, chemists, pharmacologists, epidemiologists, and other scientists. It is a highly detailed process in which FDA evaluates and must approve every aspect of the drug or biologic, including its delivery mechanism, its packaging, and its label—even down to the trade name that the sponsor proposes to use to market the drug. FDA's review almost always involves preapproval inspections of every facility involved in the production of the drug to ensure that they operate in conformance with current good manufacturing practice ("cGMP"), and if any inspection is failed, approval is withheld until FDA's observations are addressed. FDA will ultimately approve the application only if this independent and unbiased review establishes that the drug's health benefits outweigh its known risks.

28. After approval, FDA's vigorous oversight continues. All drug manufacturing establishments remain subject to routine or for-cause inspections to monitor compliance with cGMP. Sponsors must report all of their promotional materials to FDA. Sponsors must track and trace each finished product and report any deviations to the agency. Sponsors also must promptly report all adverse events to FDA. All of this is to ensure that—in FDA's words—"American consumers benefit from having access to the safest and most advanced pharmaceutical system in the world."

29. States also play an important role in regulating the sale of drugs and medicines within their borders. Before the federal government began its comprehensive regulation of the sale of drugs and medicines with the 1906 Food and Drug Act and the 1938 passage of the federal Food, Drug, and Cosmetic Act ("FDCA"),[3] this area was primarily regulated by the states. Indeed, "[b]y 1888, every state and territory except Washington Territory had a pure-food law, a pure-drug law, or both."[4] Even after the passage of the federal FDCA, states have maintained an important role in regulating the sale of drugs within state borders through state law "mini-FDCAs," many of which parallel or incorporate the federal FDCA in substantive requirements, while authorizing private enforcement. These overlapping laws allow states to protect consumers and the public health within their borders, including through authorizing private enforcement.[5] This benefits a state's consumers and the public health given FDA's "limited resources to monitor the thousands

---

[3] FDA, *A History of the FDA and Drug Regulation in the United States* (2006), https://www.fda.gov/files/drugs/published/A-History-of-the-FDA-and-Drug-Regulation-in-the-United-States.pdf

[4] Kara W. Swanson, *Food and Drug Law as Intellectual Property Law: Historical Reflections*, 2011(2) WISCONSIN L. REV. 331, 349 (2011).

[5] *See Wyeth v. Levine*, 555 U.S. 555, 574-75 (2009) (finding that the lack of an express preemption clause in the FDCA for prescription drugs "is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness").

of drugs on the market after they have been approved," let alone "the vast marketplace of consumer products that have never been submitted to FDA for pre-market review."[6]

30. Today, state laws generally prohibit the sale of drugs that are misbranded or adulterated, and many states prohibit the sale of prescription drugs that lack required approval.

31. For example, Alaska's Food, Drug, and Cosmetic Act prohibits the sale of a "new drug" unless "an application for it has become effective under the federal act" or an application has been submitted to the Alaska health commissioner. Alaska Stat. Ann. § 17.20.110(a)(1)-(2).

32. Colorado law prohibits the sale of "any new drug not authorized to move in interstate commerce under appropriate federal law." Colo. Rev. Stat. Ann. § 12-280-131(1).

33. Hawaii's Food, Drug, and Cosmetic Act prohibits the sale of any new drug unless "an application with respect thereto has been approved and the approval has not been withdrawn under section 505 of the Federal Act, or when not subject to the Federal Act . . . there has been filed with the director of health an application." Haw. Rev. Stat. §§ 328-17(a)(1)-(2).

34. Tennessee's Food, Drug and Cosmetic Act prohibits the sale of "any new drug unless an application with respect to the drug has become effective under § 505 of the federal act." Tenn. Code Ann. § 53-1-110.

35. The Texas Food, Drug, and Cosmetic Act states that "A person shall not sell, deliver, offer for sale, hold for sale or give away any new drug unless: [] an application with respect thereto has been approved and the approval has not been withdrawn under Section 505 of the [Federal Food, Drug, and Cosmetic Act]" and "a copy of the letter of approval or approvability issued by the United States Food and Drug Administration is on file with the department if the product is manufactured in this state." Tex. Health & Safety Code § 431.114(a).

---

6 Brief for the United States as Amicus Curiae, *Athena Cosmetics, Inc. v. Allergan, Inc.*, 576 U.S. 1054 (2015) (No. 13-1379), 2015 WL 2457643.

36. Finally, Washington law prohibits "introduction into intrastate commerce any new drug which is subject to section 505 of the federal act unless an application with respect to such drug has become effective thereunder." Wash. Rev. Code § 69.04.570.

## II. DRUG COMPOUNDING

### A. Compounded Drugs Are Neither Tested Nor FDA-Approved

37. Compounded drugs live at the other end of the regulatory spectrum: they are not FDA approved, do not undergo clinical trials, are not made pursuant to cGMP, and are not subject to pharmacovigilance requirements like adverse event reporting. Indeed, FDA generally does not even know what compounded drugs are produced or sold in the United States, where they are made, or by whom.[7]

38. Drug compounding is a "practice in which a licensed pharmacist, a licensed physician or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient."[8] For example, if an individual patient is allergic to an ingredient in an FDA-approved medicine, a compounding pharmacy could produce a version of that medication that does not contain the allergen for that individual patient.

39. As FDA has made clear, "[c]ompounded drugs are not FDA-approved."[9] FDA does not review compounded drugs to evaluate their safety, effectiveness, or quality before they reach patients.

---

[7] *See, e.g.*, Congressional Research Service, *Drug Compounding: FDA Authority and Possible Issues for Congress* (Jan. 5, 2018) ("[T]he majority of compounding facilities in the United States do not register with FDA …. This means that FDA often is unaware of potential problems with the drug products or facility conditions unless the agency receives a complaint.").

[8] FDA, *Human Drug Compounding* (May 15, 2025), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.

[9] FDA, *Compounding and the FDA: Questions and Answers* (current through Sept. 16, 2025), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

40. Unlike FDA-approved medications, compounded drugs are also not tested in preclinical studies or in clinical trials. Further, compounding pharmacies are not subject to many prescription drug labeling requirements or cGMP. Additionally, they are not subject to any federal reporting requirements for adverse events.

41. For these and other reasons, FDA has warned that "[c]ompounded drugs . . . do not have the same safety, quality, and effectiveness assurances as approved drugs. Unnecessary use of compounded drugs . . . exposes patients to potentially serious health risks."[10] FDA further advises that "compounded drugs should only be used to meet a patient's needs if the patient's medical needs cannot be met by an available FDA-approved drug."[11]

42. The risks FDA has identified with compounded drugs generally are heightened in the context of compounded tirzepatide-based drugs because, on information and belief, all tirzepatide used in compounded drugs is produced by foreign manufacturers—generally in China.[12] These unregistered foreign manufacturers are not subject to the same quality controls as US-based tirzepatide manufacturers (like Lilly) and, as a result, produce tirzepatide with little to no oversight. Thus, the tirzepatide used in compounded tirzepatide drugs may differ significantly from the tirzepatide used by Lilly for use in its medicines, which is produced in compliance with all applicable federal and state requirements.

---

[10] FDA, *Compounding and the FDA: Questions and Answers* (June 29, 2022), https://web.archive.org/web/20240803214713/https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[11] FDA, *FDA Alerts Health Care Providers, Compounders and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products* (July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded

[12] FDA, *National Drug Code Directory*, https://www.accessdata.fda.gov/scripts/cder/ndc/dsp_searchresult.cfm (current through Oct. 22, 2025).

43. Indeed, FDA has identified a "concerning trend about non-compliance with CGMP" from "API suppliers for compounding sites."[13] "Over the past five years, 72% of API manufacturing sites subject to FDA regulatory actions (e.g., warning letters, import alerts, and regulatory meetings) were sites that exclusively supply compounding pharmacies."[14] This is notable because the sites "represent only 18% of API manufacturers."[15]

44. On September 5, 2025, FDA went further and expressed "serious concerns with compounded versions of semaglutide and tirzepatide, including dosing errors, use of unapproved salt forms and adverse events—some requiring hospitalization."[16] According to FDA, these concerns were due in substantial part to the use of "illegal GLP-1 active ingredients imported from overseas" by compounders formulating weight-loss drugs in the United States.[17] In an effort to prevent these dangerous, foreign-manufactured active ingredients from being used to compound weight-loss drugs, FDA "established a 'green list' import alert to help stop potentially dangerous GLP-1. . .active pharmaceutical ingredients (APIs) from unverified foreign sources from entering the U.S. market."[18]

### B. Compounded Drugs Expose Patients to Serious Health Risks

45. Drug compounding exposes patients to serious health risks, and compounded drugs have caused serious patient harm. For this reason, Congress has repeatedly narrowed the scope of permissible compounding to ensure that (1) the mass production of prescription drugs only

---

13 U.S. Food & Drug Administration, Report on the State of Pharmaceutical Quality, FY 2024, available at https://www.fda.gov/media/188236/download.

14 *Id.*

15 *Id.*

16 FDA, *FDA Launches Green List to Protect Americans from Illegal Imported GLP-1 Drug Ingredients* (Sept. 5, 2025), https://www.fda.gov/news-events/press-announcements/fda-launches-green-list-protect-americans-illegal-imported-glp-1-drug-ingredients.

17 *Id.*

18 *Id.*

occurs in facilities that are required to follow cGMP, and (2) that mass-produced prescription drugs undergo the rigorous FDA review and approval process to ensures that they are safe and effective *before* they are dispensed to patients.

46. In the late 1950s, an unapproved drug called thalidomide led to a public health crisis after it had been prescribed and dispensed "to ease morning sickness caused by pregnancy" but caused a "rash of birth defects" in the United States and around the globe.[19] In response to the thalidomide tragedy, Congress declared "that in order to make regulation of interstate commerce in drugs effective, it is necessary to provide for registration and inspection of ***all establishments*** in which drugs are manufactured, prepared, propagated, ***compounded***, or processed."[20] *Cf.* 21 U.S.C. § 360(b)(1), (c), (j)(1). Congress created a narrow exception for pharmacy compounding, permitting law-abiding local pharmacies engaged in the regular dispensing of prescription drugs to compound medicines only in the regular course of their business or for sale at retail. *See id.* § 360(g)(1).

47. In the late 1980s, after the Supreme Court[21] and Congress[22] confirmed that all copies of innovative drugs require FDA approval, some scoff-law entities sought to evade that requirement under the guise of "pharmacy compounding." These entities claimed that a state license to act as a pharmacy allowed them to mass-manufacture knockoffs of approved medicines without FDA oversight. Their mass-produced, unapproved prescription drugs quickly caused serious harm. For example, in 1990, four patients died after contracting bacterial infections from

---

[19] *Abigail Alliance For Better Access to Developmental Drugs v. von Eschenbach*, 495 F. 3d 695, 725 (D.C. Cir. 2007).

[20] 21 U.S.C. 360, note (emphasis added); *see* S. Rep. 87-1744 at 13 (July 19, 1962) ("drugs should not be on the market unless the [FDA] knows who is making them, and where they are being made, and is able to inspect the facilities in which they are being made").

[21] *United States v. Generix Drug Corp.*, 460 U.S. 453 (1983).

[22] Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585.

a knockoff cardioplegia solution, while two patients lost an eye and 10 more were hospitalized after contracting bacterial infections from knockoff eye drops.[23] In 1997, a patient experienced an overdose of atropine because the knockoff he received was 100 times superpotent, while two patients were hospitalized after receiving contaminated knockoff riboflavin injections. Testifying before Congress in 1996, then-FDA Commissioner David Kessler warned that allowing drug manufacturing to continue to occur under the guise of pharmacy compounding would spawn a "shadow industry" of unapproved prescription drugs that "could result in serious adverse effects, including death."[24]

48. Accordingly, in 1997, Congress added section 503A to the FDCA to eliminate the phenomenon of "large-scale bulk compounding."[25] Congress intended to eliminate even "small-scale manufacturing under the guise of compounding." S. Rep. 105-43, 67 (July 1, 1997). This section imposed significant limitations on permissible compounding, including requirements that a prescriber must first determine that a compounded drug is necessary for an identified patient, that a compounding pharmacy may only create drugs in advance of receiving a prescription in limited quantities, that a compounding pharmacy may not distribute or dispense more than 5% of their total volume of compounded drugs over state lines, and that they may not compound "regularly or in ordinate amounts … any drug products that are essentially copies of a commercially available product." 21 U.S.C. § 353a(a), (b)(1)–(3).

49. The congressional conference report on the statute emphasized Congress's focus was to ensure compounded drugs are available "as a component of individualized therapy, while

---

23 Institute for Safe Medication Practices, S*terile Compounding Tragedy is a Symptom of a Broken System on Many Levels* (Oct. 18, 2012), https://tinyurl.com/34d7c6cs.

24 Hearings Before the Subcommittee on Health and Environment of the Committee on Commerce, *FDA Reform Legislation*, 31 (May 1, 1996).

25 *Med. Ctr. Pharm. v. Mukasey*, 536 F.3d 383, 389-90 (5th Cir. 2008).

limiting the scope of compounding so as to prevent manufacturing under the guise of compounding."[26] Congress sought to emphasize the nature of the "essentially a copy" language as an attempt to mitigate the "readily apparent . . . pretext" many compounders could utilize to manufacture drugs without the rigors of the FDA-approval process.[27]

50. The compounding industry then successfully challenged certain advertising restrictions present in the 1997 version of section 503A, causing the statute to be struck down by the Supreme Court in 2002.[28] The Court notably did not contest the need "to draw a line between small-scale compounding and large-scale drug manufacturing."[29] The Court agreed that if compounded drugs are "sold on a large enough scale that they could undergo [safety and efficacy] testing" then "they must do so."[30]

51. Following the law's invalidation, unapproved prescription drugs that were mass-manufactured under the guise of compounding continued to cause significant harm:

- In 2004, 16 patients developed acute hepatitis C from a compounded radiopharmaceutical agent.
- In 2005, 19 patients experienced blood infections, and one patient died from contaminated compounded magnesium injections.
- Between 2004 and 2006, 80 patients around the country were infected with bacteria from compounded heparin.
- In 2006, at least 70 patients had severe hypersensitivity reactions to a compounded betamethasone injection.

---

26 Conference Report, Food and Drug Administration Modernization Act of 1997, 105th Congress, House Report 105-399 (Nov. 9, 1997), at 94; *see also* Conference Report, Food and Drug Administration Modernization Act of 1997, 105th Congress, Senate Report 105-43 (Nov. 9, 1997), at 67.

27 *Id.*

28 *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002).

29 *Id.* at 370.

30 *Id.*

- In 2007, three patients were killed by compounded colchicine injections, while eight patients were infected with bacteria, and one patient died from compounded fentanyl.

- In 2009, nine patients contracted eye infections and one was blinded by compounded hyaluronidase injection.

- In 2011, five patients were blinded by compounded bevacizumab, 15 patients contracted blood infections from compounded saline, and nine patients died from contaminated parenteral nutrition solution.

- In 2012, 47 patients contracted fungal eye infections and the majority lost their vision due to contaminated retinal dye.

52. In 2012, a compounding pharmacy contaminated copies of a steroid injection that killed more than 100 Americans and sickened hundreds more.[31] Prompted by this tragedy (known as the New England Compounding Center catastrophe), Congress reenacted the limitations on pharmacy compounding in Section 503A of the FDCA without the invalidated advertising restrictions.

53. Even under these more stringent requirements, concerning and serious harm from compounded products continues:

- In 2013, eight patients contracted fungal eye infections from compounded bevacizumab, and 15 patients were infected with bacteria from compounded calcium gluconate injections.

- In 2015, seven patients contracted hepatitis C from a contaminated compounded injection therapy.

- In 2016, three children were hospitalized when they received compounded morphine injections that were 2,500 percent superpotent, while 17 patients contracted fungal infections, and two patients died, after receiving tainted compounded IV medications.

- In 2017, 43 patients reported issues including vision impairment and loss of color perception after receiving tainted compounded eye injections after

---

[31] United States Department of Justice, *Press Release: Former Director of Operations for New England Compounding Center Sentenced* (Dec. 14, 2022), https://www.justice.gov/usao-ma/pr/former-director-operations-new-england-compounding-center-sentenced.

cataract surgery, while 41 patients reported septic arthritis from contaminated compounded injections.

- In 2019, four patients developed eye infections from compounded bevacizumab, while seven patients became ill from contaminated compounded glutathione.

- Between 2019 and 2020, 29 patients contracted toxic anterior segment syndrome from compounded moxifloxacin.

- And in 2021, a compounding pharmacist pled guilty to providing-adulterated compounded drugs to surgery patients that contained an excessive amount of an inactive ingredient that can cause eye damage; at least 68 patients were injected with the adulterated drugs leading to near-immediate adverse events, including permanent blindness.

54. Many more harmful incidents likely remain unknown—because unlike manufacturers of FDA-approved medicines, compounding pharmacies do not have any federal reporting requirements for adverse events that occur when patients take their drugs.

## III. LILLY'S INJECTABLE TIRZEPATIDE MEDICINES

### A. Lilly's Long History of Developing and Manufacturing Safe and Effective Medicines

55. Lilly is an international medicine company and pharmaceutical manufacturer. Throughout its nearly 150-year existence, Lilly has pioneered countless life-changing discoveries. Today, Lilly's medicines help tens of millions of patients across the globe.

56. Lilly manufactures its medicines under strict controls in state-of-the-art facilities, which employ thousands of highly specialized personnel to ensure that Lilly's medicines meet its rigorous quality and safety standards. Producing active pharmaceutical ingredients ("APIs") is a complex, methodical, and science-based process. So is transforming API into a finished medicine.

57. As an FDA-registered drug manufacturer, Lilly must and does follow cGMP across the design, monitoring, and control of manufacturing processes and facilities—from establishing robust quality management systems to obtaining quality raw materials and detecting and

investigating product quality deviations. Each step—from chemical synthesis of the API to formulation, device assembly, and packaging—requires extensive testing and controls and specialized equipment. The result is high-quality, innovative medicines that meet FDA's gold standard and have been approved for distribution in compliance with state laws.

### B. MOUNJARO® and ZEPBOUND®

58. FDA approved MOUNJARO® and ZEPBOUND® pursuant to Lilly's new drug applications, which were the culmination of the lengthy and expensive clinical trial process described above that is designed to develop, study, and bring safe medicines to patients.

59. MOUNJARO® and ZEPBOUND® were approved after nearly a decade of development and have undergone testing in 37 completed clinical trials, with more ongoing. They are groundbreaking medicines containing a macromolecule Lilly discovered called tirzepatide. Lilly's tirzepatide medicines target patients' GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) receptors. These medicines activate both receptors to improve blood sugar control and reduce appetite and food intake.

60. Both medicines meet critical patient needs. MOUNJARO® is FDA-approved to treat type 2 diabetes, and ZEPBOUND® is approved to treat chronic weight management and obstructive sleep apnea in certain adults. Each faced unprecedented demand for periods after they became commercially available. This led to FDA placing tirzepatide injection products on its "drug shortage" list after they launched.[32]

---

[32] FDA, *Resolution of Tirzepatide Injection Product Shortage and Supply Status* (Dec. 19, 2024), https://www.fda.gov/media/185577/download. When FDA first added tirzepatide injection products to the shortage list, Lilly's MOUNJARO® was its only tirzepatide-based medicine on the market. Lilly's ZEPBOUND® medicine was approved by FDA in November of 2023 and was released commercially during the shortage period.

61. When FDA placed Lilly's medicines on its "drug shortage" list, a cast of so-called "compounders," including Southend, began mass-manufacturing their own untested, unapproved drug products purporting to contain tirzepatide.

62. On October 2, 2024, FDA determined that the shortage for Lilly's tirzepatide medicines had ended.[33] After a trade association representing compounder outsourcing facilities sued FDA seeking to enjoin its removal of tirzepatide from the shortage list, FDA reconsidered its decision.[34] FDA then conducted a thorough reevaluation of the tirzepatide supply in the United States and determined on December 19, 2024 that the shortage of tirzepatide injection products had been resolved.[35] In so finding, FDA noted that all forms of bulk compounding of tirzepatide would be prohibited after March 19, 2025.[36]

63. Today, Lilly manufactures, markets, and sells MOUNJARO® and ZEPBOUND® throughout the United States, among other places.

64. Lilly is the only lawful source of mass-produced tirzepatide in the United States. Because tirzepatide was a new active ingredient not previously approved by FDA, Lilly earned new chemical entity exclusivity for tirzepatide. As a result, through at least May 13, 2027, FDA cannot accept an application from any other person for any other tirzepatide product.

65. MOUNJARO® and ZEPBOUND® are approved only as single-active-ingredient drugs, and Lilly is not aware of any clinical studies on tirzepatide as a fixed-dose combination drug product or scientific support for the effectiveness of combining tirzepatide with pyridoxine or any other vitamin.

---

[33] FDA, *Resolution of Tirzepatide Injection Product Shortage and Supply Status* (Dec. 19, 2024), https://www.fda.gov/media/185577/download at 1.

[34] *Id.*

[35] *Id.*

[36] *Id.* at 3.

66. In addition, should a doctor decide that an individual patient needs a vitamin like pyridoxine in addition to tirzepatide, there exist numerous vitamin products currently available on the market, in both pill and injectable formulations. Lilly is unaware of any clinical studies or scientific support indicating that it is necessary to combine pyridoxine—or any other additive—with tirzepatide into a fixed-dose combination injection to achieve superior and clinically significant effects or results, as compared to prescribing tirzepatide alone or taken with a separate over-the-counter product.

## IV. SOUTHEND SELLS UNLAWFUL, UNAPPROVED COMPOUNDED TIRZEPATIDE

### A. Southend's Compounded Tirzepatide Is Not FDA-Approved and Its Sale Is Unlawful

67. Southend sells compounded tirzepatide that has been manipulated with the additive pyridoxine.[37] Southend claims to ship its compounded products in thirty-eight states, including Alaska, Colorado, Hawaii, Tennessee, Texas, and Washington, and the District of Columbia.[38] Southend also supplies its tirzepatide to patients of in-person healthcare providers and telehealth providers such as Brello, Orderly Meds, Lavender Sky Health, Unique Physique, NiceRx, and Enbody.[39]

---

[37] Southend Pharmacy, *Injectable GLP-1*, https://southendpharmacystore.com/injectable-glp-1/ (last visited Oct. 22, 2025); Reddit, *New Update from Southend Pharmacy*, https://www.reddit.com/r/tirzepatidecompound/comments/1jouybg/new_update_from_southend_pharmacy/ (last visited Oct. 22, 2025).

[38] Southend Pharmacy, *Discover Our Coverage*, https://southendpharmacystore.com/licensed-states/ (last visited Oct. 22, 2025).

[39] *See* Reddit, *Online Pharmacy Recommendations/Questions*, https://www.reddit.com/r/tirzepatidecompound/comments/1leomuy/online_pharmacy_recommendationsquestions/ (last visited Oct. 22, 2025); Orderly Meds, https://internal.orderlymeds.com/treatments/glp1s (last visited Oct. 22, 2025); Lavender Sky Health, *Tirzepatide Rx Summaries*, https://lavenderskyhealth.com/tirzepatide-rx-summaries/ (last visited Oct. 22, 2025); https://www.reddit.com/media?url=https%3A%2F%2Fpreview.redd.it%2Fwhat-compounding-sites-use-tx-pro-med-v0-6w1c1utvdwle1.jpeg%3Fwidth%3D1179%26format%3Dpjpg%26auto%3Dwebp%26s%3Dc7642d30b7c0bfd6954d0e5996eb28ec785e1e29 (last visited Oct. 22, 2025); NiceRX, *Terms of Use*,

68. In December 2024, FDA reiterated that compounded drugs that purport to contain tirzepatide (which includes Southend's), "have not undergone FDA premarket review for safety, effectiveness, and quality, and lack a premarket inspection and finding of manufacturing quality that is part of the drug approval process,"[40] and are thus not FDA-approved.

69. Multiple states prohibit the sale of unapproved drugs and require manufacturers to demonstrate their drugs are safe and effective in order to obtain regulatory approval to sell them. These states include at least Alaska, Colorado, Hawaii, Tennessee, Texas, and Washington. Southend's sale of unapproved compounded tirzepatide is unlawful and constitutes unfair competition in each of these states.

70. Nor can Southend defend its conduct by claiming that its sale of unapproved compounded tirzepatide is authorized by Section 503A of the FDCA. Section 503A allows true compounders to compound and sell prescription drugs under narrowly confined conditions. Southend routinely and regularly does not comply with several of those conditions.

71. Among other things, Southend fails to follow pharmacy compounding standards established by the United States Pharmacopeia (USP), fails to obtain necessary prescriptions, fails to maintain true and accurate records, produces more than limited quantities of prescription drugs in advance of prescriptions, distributes or dispenses more than 5% of its total prescription volume across state lines, and regularly produces large volumes of prescription drugs that are essentially copies of FDA-approved medicines.

---

https://www.nicerx.com/nicerx-terms-of-use/ (last visited Oct. 22, 2025); Enbody, *Weight Loss Solutions*, https://enbodylife.com/weight-loss-solutions/ (last visited Oct. 22, 2025).

[40] Letter from Center for Drug Evaluation and Research, at 10 (Dec. 19, 2024), https://www.fda.gov/media/184606/download.

72. In sum, Southend's operations fall outside the scope of lawful compounding permitted by federal law. Because Southend's operations do not comply with Section 503A, the state laws prohibiting distribution of unapproved drugs fully apply to it, and Southend is unlawfully engaged in the illegal mass-production of unapproved prescription drugs in violation of those laws.

**B. Unapproved Compounded Tirzepatide Exposes Patients to Serious Safety Risks**

73. FDA and related state law drug approval requirements exist for good reason. Drug approval is essential to ensure the quality, safety, and effectiveness of medications available to patients in the United States. But because of the cost of developing new drugs and the regulatory and financial burden of applying for drug approvals, there exist real financial incentives for companies to engage in large-scale manufacturing of a popular drug without paying the costs of research, clinical studies, or fees and regulatory review associated with drug approval. When companies circumvent the drug-approval process, safety and effectiveness are, at best, unknown. The danger is not merely theoretical, as manufacturing and distribution of unapproved new drugs as simple as *saline* have caused severe patient injuries, as discussed in Section II.B, *supra*.

74. Compounded versions of tirzepatide can and have caused real harm. In July 2024, FDA sent a letter to compounding advocacy organizations warning that it has received "reports describing patients who experienced adverse events following the administration of compounded . . . tirzepatide."[41] An October 2024 FDA statement warned of "multiple reports of

[41] Letter from Shannon Glueck, Branch Chief, FDA Compounding Branch 4, to Philip Dickison, CEO, Nat'l Council of State Boards of Nursing (July 16, 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/department-and-offices/bpoa/nursing/fda-safety-alert.pdf.

adverse events, some requiring hospitalization, that may be related to dosing errors" associated with compounded tirzepatide injections.[42]

75. FDA's Adverse Event Reporting System ("FAERS") database includes numerous events reported by patients and healthcare providers identifying serious reactions patients experienced while taking compounded tirzepatide, including tirzepatide compounded with pyridoxine, that resulted in disability and hospitalization.[43]

76. As of July 31, 2025, FDA had received at least one thousand reports of adverse events related to compounded GLP-1 medications, including 545 reports related to the use of compounded tirzepatide.[44] Crucially, these numbers almost certainly undercount the total harm to patients by a significant margin, because compounding pharmacies in the United States are not required to report adverse events to FDA.

77. A 2025 study compared FAERS data for compounded GLP-1 medications to that for FDA-approved products, finding that the reporting of prescribing and prescription errors was higher for compounded products, hospitalization associated with adverse effects was reported more frequently for compounded products, and that the reporting of certain adverse effects including abdominal pain, nausea, diarrhea, gallbladder inflammation, and suicidality was higher for compounded drugs.[45]

---

[42] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (Sept. 25, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[43] FDA Adverse Events Reporting System (FAERS) Public Dashboard – Tirzepatide Adverse Events, https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis.

[44] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (Sept. 25, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[45] Kenneth L. McCall et al., *Safety analysis of compounded GLP-1 receptor agonists: a pharmacovigilance study using the FDA adverse event reporting system*, Expert Opinion on Drug Safety (Apr. 29, 2025), https://pubmed.ncbi.nlm.nih.gov/40285721/.

78. As compounding of tirzepatide has become more prevalent, leading organizations and government agencies have warned the public as to the risks of such products. Thirty-eight state and territory Attorneys General and State Drug Task Forces have all warned the public about the dangers of these unsafe and unapproved products, including compounders using "non-sterile ingredients" and taking "no steps to sterilize them."[46] The Obesity Society, Obesity Action Coalition, and Obesity Medicine Association issued a joint statement regarding compounded GLP-1 medications, stating, "[u]nfortunately, many of the available alternatives [to GLP-1 therapies], like compounded versions of semaglutide and tirzepatide, are not what they are advertised to be."[47] The Pediatric Endocrine Society has also advised that "[c]linicians and patients [] should exercise caution when exploring options for non-brand name medications, particularly avoiding the use of non-FDA approved medications and those that come from non-FDA-approved compounding pharmacies."[48] Similarly, the JAMA Health Forum published a study that most websites selling compounded anti-obesity medications exclude important safety information and mislead consumers about the safety and effectiveness of their products.[49] Other patient and consumer groups have issued similar warnings, including the National Consumers League and the American

---

[46] Nat'l Ass'n of Attorneys General, *State and Territory Attorneys General Urge FDA to Take Action Against Counterfeit and Illegally Sold GLP-1 Drugs*, (Feb. 19, 2025), https://www.naag.org/policy-letter/state-and-territory-attorneys-general-urge-fda-to-take-action-against-counterfeit-and-illegally-sold-glp-1-drugs/; FDA, *FDA warns patients and health care professionals not to use compounded drugs from Fullerton Wellness* (Nov. 1, 2024), https://www.fda.gov/drugs/drug-safety-and-availability/fda-warns-patients-and-health-care-professionals-not-use-compounded-drugs-fullerton-wellness.

[47] Obesity Medicine Ass'n, *Leading Obesity Expert Organizations Release Statement to Patients on Compounded GLP-1 Alternatives* (Jan. 8, 2024), https://obesitymedicine.org/blog/leading-obesity-expert-organizations-release-statement-to-patients-on-glp-1-compounded-alternatives/.

[48] Pediatric Endocrine Society, *Statement on use of compounded semaglutide and other GLP-1 receptor agonists* (Jan. 16, 2024), https://pedsendo.org/drug-shortages/statement-on-use-of-compounded-semaglutide-and-other-glp-1-receptor-agonists/.

[49] Ashwin Chetty, et al., *Online Advertising of Compounded Glucagon-Like Peptide-1 Receptor Agonists*, JAMA HEALTH FORUM, Jan 17, 2025, available at https://jamanetwork.com/journals/jama-health-forum/fullarticle/2829225.

Diabetes Association, which recommended that patients avoid compounded products "due to uncertainty about their content, safety, quality, and effectiveness."[50]

79. Southend's own customers have voiced concerns about its compounded tirzepatide products, identifying serious issues such as ineffective and improperly packaged products. Customers have complained that "the prescription I got from Southend didn't work" and that they "felt nothing" after using Southend's tirzepatide products.[51] Multiple customers have reported Southend tirzepatide products shipped at the wrong temperature, with one noting that when they received their package, "[t]he icepack was warm and the vial was empty…now [I'm] nervous."[52]

## V. SOUTHEND'S HARMS TO CONSUMERS AND LILLY

80. Southend's unlawful manufacture and sale of untested and unapproved tirzepatide has harmed Lilly and consumers. That harm will continue if left unchecked.

81. ***First***, Southend's practices harm consumers by exposing them to untested, unapproved drug products. As explained above, the use of untested, unapproved drug products risks consumers' safety.

82. ***Second***, Southend engages in unfair competition by unlawfully selling its unapproved compounded tirzepatide products to customers throughout Alaska, Colorado, Hawaii, Tennessee, Texas, and Washington. Some sales made by Southend of its compounded tirzepatide

---

[50] Nat'l Consumers League, *NCL urges the public to heed warnings about unregulated versions of GLP-1 weight loss drugs* (Feb. 4, 2025), https://nclnet.org/the-national-consumers-league-urges-the-public-to-heed-warnings-about-unregulated-versions-of-glp-1-weight-loss-drugs/; American Diabetes Ass'n, *The American Diabetes Association Announces Statement on Compounded Incretin Products* (Dec. 2, 2024), https://diabetes.org/sites/default/files/2024-12/24.11.8%20compounding%20statement%20press%20release_FINAL.pdf.

[51] Reddit, *Anyone Use Southend Pharmacy?*, https://www.reddit.com/r/tirzepatidecompound/comments/1cu8bzw/anyone_use_southend_pharmacy/ (last visited Oct. 22, 2025).

[52] *Id.*; *see also* Reddit, *Brello Health/Southend Pharmacy*, https://www.reddit.com/r/tirzepatidecompound/comments/1kdbwya/brello_healthsouthend_pharmacy/ (last visited Oct. 22, 2025).

products would have been made by Lilly, but for Southend's unlawful and unfair competition, and Lilly has suffered financial harm as a direct result. The widespread and prolific manufacture and sale of unapproved tirzepatide products, including by Southend, has diverted sales from Lilly.

83. In December 2024, the Association for Pharmacy Compounding ("APC") acknowledged that forty compounding pharmacies had "collectively dispensed 125,000 compounded prescriptions over the past month."[53] According to APC, this represented only "a fraction of compounders preparing these medications."[54] To put this into perspective, Texas compounding pharmacy FarmaKeio stated that it would suffer "$1,750,000-$2,000,000 in lost revenue per month" due to FDA removing tirzepatide from the shortage list.[55] At least some portion of the revenue Southend earns on its sales of compounded tirzepatide are from patients who otherwise would have purchased Lilly's branded medications but for Southend's unlawful and unfair competition.

84. ***Third***, Southend's unlawful practices and unfair competition cause irreparable harm to Lilly's reputation and goodwill by promising results that consumers will not obtain from Southend's products. Southend promotes its fixed-dose combination tirzepatide and pyridoxine injections by trading on the credibility—earned through decades of safe and effective pharmaceutical manufacturing and years of clinical research and testing on tirzepatide specifically—of Lilly and its FDA-approved MOUNJARO® and ZEPBOUND®.

85. On information and belief, when consumers experience any negative results from Southend's compounded tirzepatide products, they conclude that any tirzepatide is either unsafe

[53] FDA, *Resolution of Tirzepatide Injection Product Shortage and Supply Status* 26 (Dec. 19, 2024), https://www.fda.gov/media/185577/download (quoting *Letter from Tenille Davis, OFA Chief Advocacy Officer to FDA Commissioner Robert Califf et al.* (Dec. 17, 2024)).

[54] *Id.*

[55] *Decl. of Dan DeNeui in Supp. of Pls.' Mot. for Prelim. Injun. and Stay Pending Review, Outsourcing Facilities Ass'n et al.*, 24-cv-953, Dkt. No. 67, ¶ 19 (App. 002-003) (N.D. Tex. Jan. 28, 2025).

or ineffective. Worse still, if consumers are harmed using compounded tirzepatide products, including by becoming underweight or experiencing the harmful side effects associated with untested and unregulated drugs, consumers will draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines.

86. In fact, consumers have contacted Lilly to report adverse events from taking compounded products. Consumers have also reported that taking compounded tirzepatide has resulted in trips to the emergency room and hospitalization. They have also reported receiving compounded tirzepatide without information regarding proper and safe administration and storage of the medicine. In multiple such cases, consumers have reported that they were not aware they had been taking compounded tirzepatide. Consumers have also reported feeling scammed after finding out that they were not taking Lilly's FDA-approved medicines.

87. None of this is surprising. Independent medical studies have consistently shown "significantly higher reporting odds of several [adverse events], including abdominal pain, diarrhea, nausea, suicidality, and cholecystitis," as well as "higher reporting odds of hospitalization, related to GI events" for users of compounded drugs.[56] The frequency with which Lilly receives these calls and the severity of the events reported makes clear that the unlawful manufacture and sale of tirzepatide by compounding pharmacies like Southend causes serious harm to the reputation and goodwill that Lilly has built in its brand.

[56] Kenneth L. McCall et al., *Safety analysis of compounded GLP-1 receptor agonists: a pharmacovigilance study using the FDA adverse event reporting system*, Expert Opinion on Drug Safety (Apr. 29, 2025), https://pubmed.ncbi.nlm.nih.gov/40285721/.

**<u>FIRST CAUSE OF ACTION</u>**
**Unfair Competition**
**in Violation of the Alaska Unfair Trade Practices and Consumer Protection Act**
**Alaska Stat. Ann. §§ 45.50.471 *et seq*.**

88. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

89. Southend's tirzepatide injections are prescription drugs.

90. Southend has not conducted any preclinical studies or clinical trials of its tirzepatide injections.

91. Southend has not filed any application seeking approval for its tirzepatide injections with any regulator.

92. No regulator has ever determined that Southend's tirzepatide injections are safe and effective. No regulator has ever approved them for sale.

93. The Alaska Unfair Trade Practices and Consumer Protection Act (UTPA) declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce . . . to be unlawful." Alaska Stat. Ann. § 45.50.471(a). Under the UTPA, an act is unfair if it "offends public policy as it has been established by statutes, the common law, or otherwise," if it "is immoral, unethical, oppressive, or unscrupulous," and if "it causes substantial injury to consumers (or competitors or other businessmen)." *Kenai Chrysler Center, Inc. v. Denison*, 167 P.3d 1240, 1255 (Alaska. 2007).

94. In the course of trade and commerce in Alaska, Southend engages in unfair methods of competition and unfair practices in violation of Alaska Stat. Ann. § 45.50.471(a). Southend does so by unlawfully selling unapproved drugs in Alaska, including its tirzepatide/pyridoxine injections, in violation of Alaska Stat. Ann. §§ 17.20.110(a)(1)-(2), which proscribes the sale of unapproved new drugs.

95. Southend's tirzepatide injections are new drugs within the meaning of Alaska Stat. Ann. § 17.20.370 because they are not generally recognized among experts as safe for use under the conditions prescribed, recommended, or suggested in their labeling.

96. Southend's conduct has caused substantial injury to Lilly in the form of lost sales, lost revenues, lost market share, and loss of customers that is not outweighed by countervailing benefits to any consumers or competition.

97. As a direct and proximate result of Southend's unlawful and unfair business practices, Lilly has suffered and will continue to suffer monetary damages and discernible competitive injury by the loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.

98. Lilly, as a "person who was the victim of [an] unlawful act" under Alaska Stat. Ann. § 45.50.471, has standing to bring its claims against Southend under Alaska Stat. Ann. §§ 45.50.531 and 45.50.535.

99. Southend is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Southend from further violating the law, and any other remedies the Court may deem appropriate under Alaska law.

## SECOND CAUSE OF ACTION
**Unfair and Deceptive Trade Practices**
**in Violation of the Colorado Consumer Protection Act**
**Colo. Rev. Stat. § 6-1-105(z)**

100. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

101. Under the Colorado Consumer Protection Act (CCPA), "[a] person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person: … Refuses or fails to obtain all governmental licenses or permits required to perform the

services or to sell the goods, food, services, or property as agreed to or contracted for with a consumer." Colo. Rev. Stat. § 6-1-105(z).

102. Colorado law prohibits the sale of "any new drug not authorized to move in interstate commerce under appropriate federal law." Colo. Rev. Stat. § 12-280-131(1).

103. Southend's tirzepatide injections are unapproved new drugs within the meaning of 21 U.S.C. § 321 and are not authorized to move in interstate commerce under appropriate federal law.

104. Southend has engaged in an unlawful, unfair, and deceptive trade practice by selling unapproved drugs in Colorado, including its tirzepatide/pyridoxine injections, in violation of Colorado law governing the sales of new drugs, Colo. Rev. Stat. § 12-280-131. Southend has failed to obtain all governmental licenses or permits required to sell its drugs, and therefore violates the CCPA, Colo. Rev. Stat. § 6-1-105(z).

105. As a direct and proximate result of Southend's unlawful, unfair, and deceptive trade practices, Lilly has suffered and will continue to suffer monetary damages and discernible competitive injury by the loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.

106. The CCPA creates a private cause of action "against any person who has engaged in or caused another to engage in any deceptive trade practice listed in this article. An action under this section shall be available to any person who… [i]n the course of the person's business or occupation, is injured as a result of such deceptive trade practice." Colo. Rev. Stat. § 6-1-113(1)(c).

107. Lilly qualifies as a person under the CCPA who can bring an action as the CCPA defines "person" as an "individual, corporation, business trust, estate, trust, partnership,

unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity." Colo. Rev. Stat. § 6-1-102(6).

108. Southend's unlawful, unfair, and deceptive trade practices occur in the course of its business of selling drugs.

109. Colo. Rev. Stat. § 6-1-113(1)(c) creates a cause of action for Lilly to bring these claims.

110. Southend is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Southend from further violating the law, and any other remedies the Court may deem appropriate under Colorado law.

**THIRD CAUSE OF ACTION**
**Unfair Competition**
**in Violation of Haw. Rev. Stat. §§ 480-1 *et seq***

111. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

112. Under Hawaii law, "[u]nfair methods of competition . . . in the conduct of any trade or commerce are unlawful." Haw. Rev. Stat. § 480-2(a).

113. Southend is engaged in unfair competition by selling its unapproved tirzepatide/pyridoxine injection in Hawaii without obtaining the requisite approvals to sell new drug products, in violation of Hawaii law. *See* Haw. Rev. Stat. §§ 328-17(a)(1)-(2).

114. Southend's tirzepatide injections are new drugs within the meaning of Haw. Rev. Stat. Ann. § 328-4 because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

115. In doing so, Southend lures consumers away from obtaining safe and effective treatment, such as Lilly's FDA-approved tirzepatide medicines, causing harm and injury-in-fact to

Lilly for which Southend has no justification other than to increase, beyond what Southend would have otherwise realized, its market share and revenue from the sale of unapproved drugs.

116. Southend's unlawful and unfair conduct puts health, safety, and lives at risk, leading customers to draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines and causing harm to Lilly's brand and customer goodwill.

117. As a direct and proximate result of its unlawful and unfair business practices, Southend has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines. Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

118. The practices described herein also offend established public policy regarding the protection of consumers against companies, like Southend, that engage in unfair methods of competition and sell untested, unapproved drugs.

119. Under Hawaii law, "[a]ny person may bring an action based on unfair methods of competition declared unlawful by this section." Haw. Rev. Stat. § 480-2(e).

120. Lilly is a "person" under Haw. Rev. Stat. § 480-1.

121. Lilly has standing to bring this unfair competition claim under Haw. Rev. Stat. § 480-13(a) as a person injured in business or property by Southend's unlawful and unfair actions.

122. Southend is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Southend from further violating the law, and any other remedies the Court may deem appropriate under Hawaii law.

**FOURTH CAUSE OF ACTION**
**Unfair Competition**
**in Violation of the Tennessee Consumer Protection Act**
**Tenn. Code Ann. §§ 47-18-104 *et seq***

123. Lilly repeats and realleges each allegation above as if fully set forth herein.

124. The Tennessee Consumer Protection Act ("TCPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). Under the TCPA, this includes "[a]dvertising, promoting, selling, or offering for sale any good or service that is illegal or unlawful to sell in the state." Tenn. Code Ann. § 47-18-104(b)(43)(C).

125. Southend has engaged in unfair competition by selling its unapproved tirzepatide/pyridoxine injection in Tennessee without obtaining the requisite approvals to sell new drug products, in violation of Tennessee law. *See* Tenn. Code Ann. § 53-1-110.

126. Southend's tirzepatide injections are unapproved new drugs within the meaning of Tenn. Code Ann. § 106-121 because they are not generally recognized among experts as safe for use under the conditions prescribed, recommended, or suggested in their labeling.

127. In doing so, Southend lures consumers away from obtaining safe and effective treatment, such as Lilly's FDA-approved tirzepatide medicines, causing harm and injury-in-fact to Lilly for which Southend has no justification other than to increase, beyond what Southend would have otherwise realized, its market share and revenue from the sale of unapproved drugs.

128. Southend's unlawful and unfair conduct puts health, safety, and lives at risk, leading customers to draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines and causing harm to Lilly's brand and customer goodwill.

129. Southend's unlawful practices further constitute unfair business practices in violation of the TCPA since they are substantially injurious to consumers and any utility of these

business practices is outweighed by the harm to consumers. Further, Southend's practices violate Tennessee public policy of protecting consumers by prohibiting the marketing and sale of unapproved new drugs.

130. As a direct and proximate result of its unlawful and unfair business practices, Southend has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines. Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

131. Tenn. Code. Ann. § 47-18-109 states "[a]ny person who suffers an ascertainable loss . . . as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful . . . may bring an action individually recover actual damages."

132. Lilly is a "person" under Tenn. Code. Ann. § 47-18-109.

133. Southend is "another" who used or employed "an unfair or deceptive act or practice described in § 47-18-104(b)" under Tenn. Code. Ann. § 47-18-109.

134. Southend is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Southend from further violating the law, and any other remedies the Court may deem appropriate under Tennessee law.

## **FIFTH CAUSE OF ACTION**
## **Unfair Competition in Violation of Texas Common Law**

135. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

136. Unfair competition under Texas law is the umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters. *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000).

137. The tort of unfair competition requires a plaintiff to prove only: (1) an illegal act by the defendant that (2) interfered with the plaintiff's ability to conduct its business. *W. Rsrv. Medtec Servs., LLC v. Stryker Corp.*, 2019 WL 13191641, at *8 (S.D. Tex. May 13, 2019) (citing *Taylor Pub. Co.*, 216 F.3d at 486).

138. Southend has engaged in an illegal act by selling unapproved new drugs in Texas in violation of violation of the Texas Food, Drug, & Cosmetic Act, Tex. Health & Safety Code Ann. § 431.114(a).

139. Southend's tirzepatide injections are unapproved new drugs within the meaning of Tex. Health & Safety Code Ann. § 431.002 because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

140. Southend's illegal conduct has interfered with Lilly's ability to conduct its business through sales of tirzepatide that otherwise would have been made by Lilly and through harm to Lilly's brand and customer goodwill.

141. Because Southend's illegal conduct has interfered with Lilly's ability to conduct its business, Lilly has a cause of action under the Texas common law of unfair competition to bring this claim.

142. Southend has engaged in unfair competitive acts or practices by advertising, promoting, selling and offering for sale in Texas its unapproved new drugs in violation of the Texas Food, Drug, & Cosmetic Act, Tex. Health & Safety Code Ann. § 431.114(a).

143. In doing so, Southend lures consumers away from obtaining safe and effective treatment, such as Lilly's FDA-approved tirzepatide medicines, thereby interfering with Lilly's ability to conduct its business.

144. Southend's unlawful and unfair conduct puts health, safety, and lives at risk, harming Lilly by creating a risk that customers will draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines.

145. As a direct and proximate result of its unlawful and unfair business practices, Southend has obtained an unfair and illegal business advantage, benefitting and profiting from sales made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines. Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

146. Southend's unfair conduct is interfering with Lilly's ability to conduct its business. As a direct and proximate result of Southend's unfair business practices, Lilly is suffering immediate and continuing, competitive, irreparable injury for which no adequate remedy at law exists.

147. The practices described herein also offend established public policy regarding the protection of consumers against companies, like Southend, that engage in unfair methods of competition.

148. Lilly is entitled to reasonable attorney's fees and costs pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

## SIXTH CAUSE OF ACTION
**Unfair Competition**
**in Violation of the Washington Consumer Protection Act**
**R.C.W. §§ 19.86.010 *et seq***

149. Lilly repeats and realleges each allegation above as if fully set forth herein.

150. Under the Washington Consumer Protection Act (WCPA), "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. R.C.W. § 19.86.020.

151. Southend has engaged in unfair competition by selling its unapproved tirzepatide/pyridoxine injection in Washington without obtaining the requisite approvals to sell new drug products, in violation of Washington law. *See* R.C.W. § 69.04.570.

152. Southend's tirzepatide injections are unapproved new drugs within the meaning of Wash. Rev. Code Ann. § 69.04.018 because they are not generally recognized among experts as safe for use under the conditions prescribed, recommended, or suggested in their labeling.

153. Southend's unlawful practices affect the public interest. They are substantially injurious to consumers and any utility of these business practices is outweighed by the harm to consumers. Further, Southend's practices violate Washington public policy of protecting consumers by prohibiting the marketing and sale of unapproved new drugs.

154. As a direct and proximate result of Southend's unlawful and unfair practices, Lilly has suffered and will continue to suffer monetary damages and discernible competitive injury by the loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.

155. Under the WCPA, "[a]ny person who is injured in his or her business or property by a violation of RCW 19.86.020 . . . may bring a civil action in superior court to enjoin further violations [and] to recover the actual damages sustained." R.C.W. § 19.86.090.

156. Lilly is a "person" as defined by § R.C.W. 19.86.010.

157. Lilly has standing to bring this claim as a "person who is injured in his or her business or property by a violation of RCW 19.86.020."

158. Southend is liable to Lilly for damages in amounts to be proven at trial, including attorneys' fees and costs, injunctive relief enjoining Southend from further violating the law, and any other remedies the Court may deem appropriate under Washington law.

**JURY DEMAND**

Lilly hereby demands a jury trial for all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Lilly prays that this Court enter judgment in Lilly's favor on Lilly's claims and award Lilly relief including:

1. An Order declaring that Southend:

   i. Engaged in unfair trade practices in violation of the Alaska Unfair Trade Practices Act by its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of the Alaska Food, Drug, and Cosmetic Act;

   ii. Engaged in unfair trade practices in violation of the Colorado Consumer Protection Act by its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of Colo. Rev. Stat. § 12-280-131(1);

   iii. Engaged in unfair competition in violation of Haw. Rev. Stat. §§ 480-1 *et seq* by its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of Haw. Rev. Stat. §§ 328-17(a)(1)-(2);

   iv. Engaged in unfair trade practices in violation of the Tennessee Consumer Protection Act by its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of Tenn. Code. Ann. § 53-1-110;

   v. Violated Texas Health & Safety Code § 431.114(a)(1), which constitutes unfair competition under Texas common law, by its unlawful manufacture, distribution, and sale of unapproved new drugs; and

   vi. Engaged in unfair trade practices in violation of the Washington Consumer Protection Act by its unlawful manufacture, distribution, and sale of unapproved new drugs in violation of R.C.W. § 69.04.570.

2. An injunction preliminarily and then permanently enjoining and restraining Southend and its officers, agents, employees, and attorneys and all persons acting in concert or participation with any of them from marketing, distributing, dispensing, selling, or otherwise making available to consumers Southend's tirzepatide products.

3. An Order directing Southend to file with this Court and serve on Lilly's attorneys, thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which it has complied with the Court's injunction.

4. An Order requiring Southend to pay Lilly compensatory damages in an amount as yet undetermined caused by Southend and trebling such compensatory damages for payment to Lilly in accordance with the Alaska Unfair Trade Practices Act, the Colorado Consumer Protection Act, Haw. Rev. Stat. §§ 480-1 *et seq*, the Tennessee Consumer Protection Act, Texas common law, the Washington Consumer Protection Act, and any other applicable laws.

5. An Order for pre-judgment and post-judgment interest on all damages.

6. An Order requiring Southend to pay Lilly's costs and attorneys' fees in this action pursuant to the Alaska Unfair Trade Practices Act, the Colorado Consumer Protection Act, Haw. Rev. Stat. §§ 480-1 *et seq.*, the Tennessee Consumer Protection Act, Tex. Civ. Prac. & Rem. Code § 37.009, the Washington Consumer Protection Act, and any other applicable provision of law.

7. Other relief as the Court may deem appropriate.

Dated: October 22, 2025

Respectfully submitted,

*/s/ Eugene Temchenko*

Eugene Temchenko
Texas Bar No. 24118928
Attorney-in-Charge
Southern District No. 3929004
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Texas 75205
Telephone: (214) 432-5072
Facsimile: (214) 972-1771
eugene.temchenko@kirkland.com

Diana M. Watral (*pro hac vice forthcoming*)
Robin McCue (*pro hac vice forthcoming*)
Ryan Moorman (*pro hac vice forthcoming*)
James Hileman (*pro hac vice forthcoming*)
Nicholas M. Ruge (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
james.hurst@kirkland.com
diana.watral@kirkland.com
robin.mccue@kirkland.com
ryan.moorman@kirkland.com
jhileman@kirkland.com
nicholas.ruge@kirkland.com

Joshua L. Simmons (*pro hac vice forthcoming*)
Jeanna Wacker (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.simmons@kirkland.com
jeanna.wacker@kirkland.com

David I. Horowitz (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
2049 Century Park East, 38th Floor
Los Angeles, CA 90067
Telephone: (310) 552-4200
dhorowitz@kirkland.com

*Counsel for Plaintiff Eli Lilly and Company*